## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

**UNITED STATES OF AMERICA**                                    **CRIMINAL ACTION**

**VERSUS**                                                                          **NO:  09-123**

**DAVID SAMUELS**                                                      **SECTION: "S" (3)**

### ORDER AND REASONS

**IT IS HEREBY ORDERED** that David Samuels' Motion Under 28 U.S.C. § 2255 to

Vacate, Set Aside or Correct Sentence by a Person in Federal Custody (Doc. #506) is **DENIED**.

### BACKGROUND

This matter is before the court on David Samuels's Motion Under 28 U .S.C. § 2255 to

Vacate, Set Aside, or Correct Sentence by a Person in Federal Custody.

The United States Court of Appeals for the Fifth Circuit has explained the underlying facts

of this case as follows:

> On December 4, 2009, the grand jury returned a superseding
> indictment against Defendants – Appellants David Samuels, Charles
> Moss, and Jermaine Surtain, variously charging them and three other
> co-defendants with one count of conspiracy to commit mail and wire
> fraud under 18 U.S.C. § 371, three counts of mail fraud under 18
> U.S.C. § 1341, seven counts of wire fraud under 18 U.S.C. § 1343,
> one count of use of fire to commit obstruction of justice and two
> counts of use of fire to commit mail fraud under 18 U.S.C. §
> 844(h)(1), one count of making a false statement under 18 U.S.C. §
> 1001, and aiding and abetting under 18 U.S.C. § 2 as to the wire
> fraud, mail fraud, and use-of-fire counts. The charges arose from
> separate insurance fraud schemes that culminated in arson, murder,
> and the destruction of a van used in the killing.
>
> At trial, cooperating co-defendant Damian Landry testified that
> Samuels worked with him at Volunteers of America, an elder care
> provider in New Orleans. When Landry and his wife fell behind on
> mortgage payments for her house in 2002, Samuels advised Landry
> to increase his insurance coverage on the house and burn it down for
> the proceeds. Landry agreed, and Samuels set out to find someone
> who would set fire to the house for a share of the insurance money.

Samuels ultimately recruited Moss, an army buddy of his from Detroit.

Landry testified that on the day the house burned down, he and Samuels reported to work, and Landry then left to get breakfast. Samuels and Moss met Landry later that morning and told him they would burn the house that day. Samuels gave Landry the keys to his green Chrysler van, and Landry gave Samuels the keys to a white 1991 Chevrolet with temporary tags. The car was unregistered, making it impossible to trace. At Samuels's direction, Landry went to a client's house so that he would have an alibi.

A neighbor testified that he was at home when he heard an explosion from across the street. When he got to the window, he saw Landry's house burning. He also saw a man with a burned face and hair leave the house and enter an older white car with temporary tags, which then sped away. Landry received a phone call from his probation officer, who told him that his house was on fire. Before Landry could return home, Samuels called and told him to come to Samuels's house. When he arrived, Samuels and Moss entered Landry's vehicle. Moss's face was burned, and Samuels said they had to take Moss to the hospital. Landry refused, and Samuels instead had his brother Chris take Moss. Landry then returned home to find his house destroyed. He and Samuels later took the white Chevrolet to a wrecking yard to be demolished.

Landry filed a fire insurance claim on the house, but did not mention the arson to the insurance company. Because the insurance payment he received was not as large as he had anticipated, he used it to pay the mortgage company and did not tell Samuels that he had obtained the money. After Samuels pressured him for the insurance proceeds several times (sometimes violently), Landry gave Samuels $3,000 from his tax refund.

Landry further testified that while the fire insurance claim was pending in July 2003, he accompanied Samuels to insurance agent Stefan James's office. Samuels and James (a cooperating co-defendant in this matter) discussed obtaining $100,000 to $150,000 of insurance coverage on the life of Treyor Winston August, Samuels's cousin. To that end, Samuels unsuccessfully sought to convince Landry to pose as August.

James testified that he knew Samuels through his wife, who also worked at Volunteers of America. James had sold life insurance

2

policies to Samuels and Samuels's wife, and had socialized with Samuels on occasion. James described Samuels as a braggart, and testified that Samuels once said he would have his cousin killed for stealing drugs from him. Several weeks after making this statement, Samuels came to James's office with Landry.

Even though James was aware of Samuels's fraudulent and murderous intentions, he ultimately sold Samuels a "double-indemnity" life insurance policy. This meant that although the policy's face value was $75,000, it would pay out $150,000 if August's death were accidental. Samuels structured the policy in this way because any policy with a face value of $100,000 or more would have prompted the underwriter to collect the insured's blood and urine, and administer a medical exam. August surely would have become aware of the policy had he been asked for these things. The policy's beneficiaries—Samuels and his mother, Teresa—were falsely listed as August's brother and mother. Although August was listed as the policy's owner, Samuels signed August's name on the application, had his own address listed on the policy to prevent August from discovering its existence, and also noted on the application that August should not be contacted at his workplace regarding the policy. Samuels was involved in three subsequent fraudulent policies: (1) (h)e took out a second policy on August's life for $25,000, the beneficiary being his sister, co-defendant Maria Samuels; (2) he provided information to allow James to obtain a $25,000 policy on August's life; and (3) he obtained a $90,000 "key man" policy on August's life, the beneficiary being his company, Sam's Realty and Maintenance.

Samuels's brother Chris, who had taken Moss to the hospital following the Landry house fire, testified that Samuels asked him to kill August for $20,000. Samuels showed him one of the fraudulent life insurance policies to demonstrate a means of payment. Chris testified that he was unwilling to kill his cousin, but, wanting to stall Samuels and warn August, said he would do it. Chris told August of Samuels's plan and the insurance policy, and gave him a gun for protection. As he related at trial, however, he felt that August did not take the threat seriously.

Apparently becoming impatient that Chris had not killed August, Samuels eventually sought someone else for the task. According to phone records, Samuels placed two calls on April 24, 2004 to Surtain, who was his sister's ex-boyfriend and the father of her child, and who had recently returned to New Orleans. Kelvin Marshall, who three

years later would be apprehended with Surtain in a burglary, testified that between 9:00 and 10:00 PM on April 24th, Surtain called him to obtain nine-millimeter rounds for a pistol. Marshall went to a friend's house on Cortez Street to retrieve the ammunition. He then gave it to Surtain, who was waiting outside with his girlfriend. The girlfriend dropped Marshall off at a nearby bar; Surtain test-fired the pistol out the vehicle's window along the way. The girlfriend dropped Surtain off on Canal Street near Warren Easton High School.

August's girlfriend testified that Samuels came to her house on April 24th to ask for August. Although August was not home the first time Samuels came by, Samuels returned a second time after he had come back from work. Samuels stayed for a while, then left. Around nightfall, Moss came to August's home in Samuels's green van. Moss spoke with August, left, then returned between 8:00 and 8:30 PM. He and August left between 9:00 and 9:30 PM, purportedly to celebrate August's birthday. Samuels attended a church service that night.

Samuels later told a special agent of the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) that August had been shot in "the van," ran away, struggled with the shooter, and was shot once more. A trail of blood consistent with this version of events was found at the murder scene. An eyewitness testified that he and his wife were driving south on Bienville Street between 9:50 and 10:00 PM on April 24th. Shortly after they crossed Jefferson Davis Parkway, the witness saw a man bending over another man on the median, and noticed the man on the ground had a large amount of blood on his shirt. As the witness drove away, the first man shot the other one in the head. An autopsy revealed that August had been shot six times, including once in the head. Police recovered spent nine-millimeter casings from the murder scene.

Surtain's girlfriend testified that Surtain called her later that night to pick him up because police were in the area. She picked him up about two blocks away from Jefferson Davis Parkway, and dropped him off on Cortez Street. Marshall testified that Surtain returned to the house on Cortez Street that night. Surtain's jeans were covered in blood. The next day, Surtain told Marshall and others that "he shot a dude" who then wrestled Surtain to the ground, causing him to drop the gun. Surtain said that he "slammed the dude," retrieved the gun, and shot him again. James testified that Samuels told him he had cleaned out blood from the van with bleach or ammonia.

4

At 10:53 PM on April 24th, Samuels called James, and said, "Winston ha[s] been killed. He's dead. What do we need to do to get the claims process going?" To avoid suspicion, James advised Samuels to wait before filing a claim. Samuels's sister's claim was filed in June 2004, and his mother's claim was filed in July 2004. The insurance companies denied the claims due to misrepresentations on the applications, and mailed refunds of the premiums to Samuels, his sister, and his mother.

A New Orleans police investigator spoke with Moss and Samuels on the morning of April 26th, and explicitly told Moss not to leave town until the detective investigating August's murder could interview him. Samuels's girlfriend took Moss to the bus station later that day, where he boarded a bus for Detroit. Although Moss initially told police that August was alive and walking up the street the last time Moss had seen him, he later told ATF agents that he saw August lying in the fetal position after Moss exited a bar.

A GEICO employee testified that on April 28, 2004, someone requested increased coverage on Samuels's van. Samuels's ex-wife and then-girlfriend, Yolanda Fleming, testified that Moss called her and Samuels's home on the night of May 7, 2004, asking for Samuels. Samuels, who had just returned home, spoke with Moss for about five minutes, then left the house. Samuels testified that he had also spoken with Surtain that night, but said their conversation had been about drugs. Phone records showed that Samuels and Surtain called each other twenty-six times on May 7th, including shortly before midnight.

Between 1:00 and 2:00 AM on May 8th, Samuels called Fleming to ask about his van, which was parked outside their house. Fleming said the van was okay, then went back to sleep. Phone records showed that Samuels called Surtain immediately after Fleming hung up, and again nine minutes later. Fleming was later awoken by an explosion, and saw that the van was on fire. Security camera footage showed that two individuals carrying something approached the van that night and broke the passenger window. Shortly thereafter, the van ignited. A fire inspector testified that the arsonists had probably poured a flammable liquid into the car and set fire to it.

After Fleming alerted emergency services, she called Samuels to tell him what had happened. He instructed her to give the firemen and police a piece of paper on which she had, at his direction, written times and dates when he had purportedly received threatening phone

calls. Fleming testified that she had never received any threatening phone calls or been present when Samuels received one. Samuels later suggested to his friend, Tony Veal, that the arsonists destroyed the van because they thought Samuels had killed August. Upon being questioned about the threats, Samuels was unable to relate any details about their nature or content.

The fire inspector who examined the van testified that it was abnormally parked in an area where it would not cause Samuels's house to catch fire, but was still in view of the security camera. Samuels stated that he had moved the van between 2:00 and 3:00 PM on May 7th to wash it. The investigator noticed, however, that the closest water spigot was on the corner of the house opposite the van. Samuels reported the fire to his insurance company on May 8th. The insurance company issued a check to him for $4,094, which he later cashed.

Three years after these events took place, Surtain and Marshall were apprehended in a burglary. Acting on information provided by Marshall, the ATF initiated an investigation, during which ATF agents interviewed Samuels about the life insurance policies he had obtained from James. Although he sought to appear cooperative and provided some information about the murder, Samuels told the *273 agents, "I didn't have any life insurance on [August]." The agents knew this statement was false because they had obtained insurance records showing that Samuels's company had paid the premiums. Samuels warned James that agents had interviewed him, and would likely seek to interview James as well. He warned James not to "rat," while at the same time making the motion of pulling a gun trigger.

The government later indicted Samuels, Moss, Surtain, and three other co-defendants. While under indictment, Surtain spoke about his case to his cellmate in St. Bernard Parish Jail, Orlando Brown. He told Brown, inter alia, that his case involved arson and fraud; he was not worried about being convicted because he had disposed of the gun he had used to commit his crime; he had not been charged with murder; he had sent someone to pick up the murder victim; he had "tussled with the guy and then he shot him"; he was not worried about his child's mother or her brother testifying against him because he knew at which jail the brother was being housed; his case involved insurance; his child's mother and her brother were beneficiaries, but he was not a main beneficiary; and "if everything went right," he would be paid for his part in his crime. He also stated that "they had a policy to get this guy, he was supposed to pick the guy up on his

6

birthday." Insurance records established that August was murdered the day before his twenty-seventh birthday. While he was incarcerated, Surtain made two recorded phone calls—one to Samuels's father and another to Samuels. Surtain asked Samuels's father to tell Samuels that he was "dummying up all the way around," and that it would be best if Samuels would also "dummy up." In Surtain's call to Samuels, they agreed not to cooperate with investigators.

After an eight-day trial, the jury found Surtain and Moss guilty of conspiracy to commit mail and wire fraud, and use of fire to commit obstruction of justice in relation to the van fire. Moss was also found guilty on one count of use of fire to commit mail fraud in relation to the house fire. Samuels was found guilty on all fifteen counts. Once again, these included one count of conspiracy to commit mail and wire fraud, three counts of mail fraud, seven counts of wire fraud, one count of use of fire to commit obstruction of justice, two counts of use of fire to commit mail fraud, one count of making a false statement, and aiding and abetting. 18 U.S.C. §§ 2, 371, 844(h)(1), 1001, 1341, 1343.

Moss and Surtain were respectively sentenced to 420 months' and 180 months' imprisonment. Samuels was sentenced to 900 months' imprisonment. They timely appealed.

United States v. Surtain, 519 Fed. Appx. 266 (5th Cir. 2013).

After a rehearing on Samuels's direct appeal, the United States Court of Appeals for the Fifth Circuit vacated Samuels's sentence as to Count 4 based on insufficient evidence of a mailing in furtherance of a scheme to defraud. Id. at 286-87. The appellate court also vacated one of the convictions on Counts 12 or 13, at the government's election, finding that it was an error to impose multiple sentences under § 844(h)(1) based on a single fire incident that facilitated two underlying felonies. Id. at 281-82. The matter was remanded to the district court for re-sentencing. Id. at 295-96.

On October 15, 2013, Samuels filed a motion for new trial. On December 15, 2013, this court denied the motion finding that it was untimely.

Thereafter, the government elected to vacate Samuels's conviction as to Count 12.  On January 23, 2014, this court re-sentenced Samuels to a total of 660 months imprisonment.

On September 5, 2014, Samuels filed a motion for reconsideration of this court's December 15, 2013, Order denying his motion for a new trial.  On October 2, 2014, this court denied the motion for reconsideration.

Samuels also appealed his re-sentencing to the United States Court of Appeals for the Fifth Circuit arguing that the district court violated United States v. Alleyne, 133 S.Ct. 2151 (2013), by applying the cross-reference to §2A1.1 of the United States Sentencing Guidelines for first degree murder and that his counsel provided ineffective assistance at re-sentencing.  On April 1, 2015, the appellate court affirmed the district court's judgment on Samuels's re-sentencing.

On August 24, 2015, Samuels filed the instant motion to vacate pursuant to §2255. Samuels argues that this court should set aside his conviction and sentence because his trial counsel was ineffective for failing to challenge the impartiality of the jury after the jurors inquired as to whether the defendants were in custody, and for failing to put forth evidence pertaining to a statement Samuels made to an agent of the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") regarding whether he had insurance policies on August's life.  Samuels also argues that Count 1 of the Superseding Indictment was duplicitous; a violation of 18 U.S.C. 844(h)(1), which is charged in Count 13 of the Superseding Indictment, was prescribed because it has a five-year statute of limitations; and, the charge in Count 13 of the Superseding Indictment was insufficient because Samuels was not separately charged with the underlying offense of mail fraud.  Further, Samuels argues that there is new evidence proving his actual innocence as to Count 13.

8

## ANALYSIS

Pursuant to § 2255, a prisoner in custody under a federal court sentence may seek relief on four grounds: (1) "that the sentence was imposed in violation of the Constitution or laws of the United States"; (2) "that the court was without jurisdiction to impose such sentence"; (3) "that the sentence was in excess of the maximum authorized by law"; or, (4) that the sentence "is otherwise subject to collateral attack." 28 U.S.C. § 2255.  If the district court determines that a petitioner is entitled to relief under § 2255, the court "shall vacate and set the judgment aside and shall discharge the prisoner or resentence him or grant a new trial or correct the sentence as may appear appropriate." 28 U.S.C. § 2255(b).

Relief under § 2255 "is reserved for transgressions of constitutional rights and for a narrow range of injuries that could not have been raised on direct appeal and would, if condoned, result in a complete miscarriage of justice." United States v. Segler, 37 F.3d 1131, 1133 (5th Cir. 1994) (quoting United States v. Vaughn, 955 F.2d 367, 368 (5th Cir. 1992) (per curiam)). Accordingly, "[a] defendant . . . may not raise an issue for the first time on collateral review without showing both 'cause' for his procedural default, and 'actual prejudice' resulting from the error." United States v. Shaid, 937 F.2d 228, 232 (5th Cir. 1991). A defendant can establish "cause" by showing that an objective impediment that is external to his defense prevented him from raising a claim on direct appeal. United States v. Flores, 981 F.2d 231, 235 (5th Cir. 1993). To show "actual prejudice" the defendant must demonstrate not just the possibility of prejudice, "but an actual and substantial disadvantage, infecting his entire [proceedings] with error of constitutional dimension." Shaid, 937 F.2d at 233.

The government points out that Samuels did not raise on direct appeal any arguments regarding Count 1 of the Superseding Indictment being duplicitous, the statute of limitations for 18 U.S.C. 844(h)(1), the insufficiency of Count 13 of the Superseding Indictment, or new evidence proving his actual innocence as to Count 13.  Samuels was represented by counsel on direct appeal and he has not demonstrated cause for failing to raise these arguments on direct appeal.  Therefore, he is procedurally barred from raising them in this collateral proceeding, and the petition is DENIED as to these claims.

In this collateral proceeding, Samuels also raises issues pertaining to ineffective assistance of counsel, arguing that his trial counsel was deficient for failing to challenge the impartiality of the jury after the jurors inquired as to whether the defendants were in custody, and for failing to put forth evidence pertaining to a statement Samuels made to an ATF agent regarding whether he had insurance policies on August's life.  "[A]bsent unusual circumstances, ineffective assistance of counsel, if shown, is sufficient to establish the cause and prejudice necessary to overcome a procedural default." United States v. Walker, 68 F.3d 931, 934 (5th Cir. 1995).

To succeed on a claim of ineffective assistance counsel, petitioner must show: (1) that his counsel's performance was deficient; and (2) that his counsel's deficient performance prejudiced his defense. Strickland v. Washington, 104 S.Ct. 2052, 2064 (1984). Deficient performance by counsel is established by showing "that counsel's representation fell below an objective standard of reasonableness." Id. at 2064. In applying this standard, the "court must indulge a 'strong presumption' that counsel's conduct falls within the wide range of reasonable professional assistance because it is all too easy to conclude that a particular act or omission of counsel was unreasonable in the harsh light of hindsight." Bell v. Cone, 122 S.Ct. 1843, 1854 (2002) (quoting Strickland, 104

S.Ct. at 2052). To demonstrate prejudice caused by counsel's allegedly deficient performance, the petitioner must show that there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 104 S.Ct. at 2068. Petitioner must show that counsel's errors were serious enough to deprive him of a fair trial, of which the result would have been reliable. Id. at 2064.

As to Samuels argument that his trail counsel was ineffective for failing to challenge the impartiality of the jury after the jurors inquired as to whether the defendants were in custody, after consulting with counsel, the court informed the jury that none of the defendants were free on bond. The instruction was suggested by counsel for co-defendant Surtain. Samuels has not demonstrated that his counsel was ineffective for failing to object to the instruction because Samuels's own testimony at trial revealed that he was incarcerated. Specifically, he testified that he was incarcerated with Kelvin Marshall, a witness in the case.

Moreover, Samuels has not demonstrated any prejudice resulting from his counsel's failure to object to the jury being informed by the court that none of the defendants were free on bond. The instruction the court gave did not imply the defendants' guilt, and the court repeatedly instructed the jury that its verdict must be based on the evidence presented at trial and the law. Lack of prejudice is demonstrated by the jury's acquittal of Moss and Surtain on some charges. The United States Court of Appeals for the Fifth Circuit has held that "[t]he jury's ability to discern a failure of proof of guilt of some of the alleged crimes indicates a fair minded consideration of the issues . . .", which indicates that the jury was not biased. United States v. Arzola-Amaya, 867 F.2d 1504, 1514 (5th Cir. 1989). Therefore, Samuels's petition is DENIED as to his claim of ineffective assistance of counsel regarding challenging the jury's impartiality.

11

Samuels also argues that his trial counsel was ineffective for failing to put forth evidence pertaining to a statement Samuels made to an ATF agent regarding whether he had insurance policies on August's life. Count 15 of the Superseding Indictment charged Samuels with making a false statement to an ATF agent. Specifically, Count 15 charged that on April 15, 2008, Samuels falsely

> denied that he has any involvement in applying for and obtaining an insurance policy on the life of Treyor August and was unaware of who the beneficiaries were, when in truth in fact, as the defendant well knew, he caused insurance agent Stefan James to make applications for life insurance on Treyor August, naming himself, his mother T.S. and his sister Maria Samuels as beneficiaries, paid the premiums on those policies, and after orchestrating the killing of Treyor August, caused claims to be made against the death benefits on the insurance policies; in violation of Title 18 United States Code, Section 1001.

Samuels argues that he did not make a false statement to the ATF agent because the agent asked him if he currently had a life insurance policy on Treyor August. Samuels argues that his negative response to the question was accurate because, at the time the agent asked, he did not have any life insurance policies on August. Samuels contends that his trial counsel was ineffective for failing to put forth this evidence.

Samuels has not demonstrated that his trial counsel was deficient in this respect, or that there was any prejudice. A video of the ATF agent's interview with Samuels was admitted into evidence. The ATF agent asked Samuels about his knowledge of a life insurance policy on August's life, and Samuels responds that he "never had insurance on" August. It is clear that the agent was trying to ascertain whether Samuels had insurance policies on August's life at the time of August's death, not at the time of the interview. Further, when Samuels's counsel asked him why he did not tell the ATF agent about the insurance policy, Samuels testified: "I don't recall them asking me about that policy.

12

I'm not sure.  I'm not sure."  Samuels also testified: "They may have asked me, but when they asked – I think about when they asked me about insurance, I wasn't sure what they was asking about.  I don't know.  I didn't think nothing of it[,]"  and " I knew there had been a policy. And when they asked me. I really don't recall what was the reason at the time for the answer I gave them.  I know when we were – they were interviewing me, they asked me all kinds of questions that I just answered without thinking about it – if I wasn't sure, I just said an answer.  So I can't say why."  Samuels's attorney gave Samuels the opportunity during his trial testimony to offer the explanation that Samuels now argues his attorney failed to raise.  Thus, Samuels's attorney was not ineffective in this respect, and Samuels's petition is DENIED as to this claim.

## CONCLUSION

**IT IS HEREBY ORDERED** that David Samuels' Motion Under 28 U.S.C. § 2255 to Vacate, Set Aside or Correct Sentence by a Person in Federal Custody (Doc. #506) is **DENIED**.


New Orleans, Louisiana, this __20th__ day of January, 2016.


**MARY ANN VIAL LEMMON**
**UNITED STATES DISTRICT JUDGE**